## John Glenn *vs.* Loxley H. Thistle, Executor.

B., in 1839, conveyed one thousand four hundred and seventy-seven acres of land in Louisiana, belonging to the United States, to H., who conveyed it to L. by a deed of general warranty, receiving a part of the purchase-money in cash, and the residue partly in the notes of third persons, and partly in the notes of L. H. also bound himself to procure title to be made to L. for an equal quantity of back land, the title to which was then in the United States. L. died soon afterwards, and T. became his executor; and in 1840, H., upon discovering that his title had failed, surrendered to T. all the notes, then under his control, that he had received from L., and aided in procuring a title to be made directly to T., in his individual capacity, for the lands embraced in the deed from H. to L. Some of the titles were obtained by purchases at the public sales of the lands, and some from other persons who had purchased at the public sales, or acquired titles under the preëmption laws. One of the notes executed by L. to H. for a part of the purchase-money, having been assigned by H., the assignee sued T. upon it as executor of L., and the defence set up was failure of consideration; *held*, under the facts of the case, that there was a total failure of the consideration of the note.

Where a contract is made in one State for the purchase of land lying in another, and the money is to be paid in the State in which the contract is made, the *lex rei sitæ* will govern as to the title to the land, and the *lex loci contractûs*, as to the effect of a failure of consideration.

There must be a total failure of consideration, and an actual eviction, or what is equivalent thereto, to enable the maker of a note, given for the purchase-money of land, who is in possession under a deed containing a general covenant of warranty, to avail himself of the failure of his title as a defence to an action at law upon the note.

A conveyance of land, to which the grantor is entitled under the preëmption laws, made prior to the issuance of the patent, is prohibited by the laws of the United States; is absolutely void, and communicates no title to the purchaser.

An executor, or other trustee, must act in relation to the trust property, for the benefit of the *cestui que trust*, and cannot avail himself of his position, or of information which he acquires by it, to acquire adverse interests in the property. But where a testator in his lifetime made a void contract for the purchase of lands, and acquired no interest in the lands under the contract; and the contract, after his death, appears to have been rescinded, or regarded as having been rescinded, by his executor and the vendor; *semble*, that the

Glenn *v.* Thistle, Executor.

executor of the vendee is under no legal disability to purchase the same lands, on his individual account, from the rightful owner.

A legal and sufficient eviction may, in some cases, take place without an actual ouster, and without a suit. And if land belonging to the United States be conveyed by deed, with covenants of general warranty, and be afterwards sold by the government, such sale carries with it a constructive possession to the purchaser, and is equivalent to an actual eviction of the grantee in the deed.

If an executor induce a third person to trade for a note of his testator, by representing that there is no offset against it, and that it will certainly be paid, such representations will not bind the estate of the testator, or preclude the executor from showing a failure of the consideration for which the note was executed.

It is the duty of the executor to discharge existing obligations ; but it is not his duty or his privilege to create new ones, unless he is authorized to do so by *law, or by the will,* so as to bind the estate of his testator. Whether he may not render himself personally responsible for promises made by him as executor, *quære.*

APPEAL from the circuit court of Adams county; Hon. Stanhope Posey, judge.

This suit is founded on a note given by Israel Leonard, and which was also indorsed by Thistle, the appellee, for the sum of $3333.33. Glenn became the holder of the note after the death of the maker, (Leonard,) and instituted this suit against Thistle as executor of the deceased, Leonard. The defence set up to the note is an entire failure of consideration. The record shows that this note was executed and delivered to E. C. Hyde, in part payment of the purchase-money of a tract of land, sold by Hyde to Leonard for $45,000. When Hyde sold the land he conceived he had a title to it under a grant from the Spanish government to John Rhaed, and a certificate of confirmation from the commissioners under the laws of the United States for part of the land. The land was described as lying on Lake St. Peter, in Concordia county, Louisiana. But it was discovered soon after the sale to Leonard, that the claim which he (Hyde) thought he had, did not cover the land he had sold. The Spanish government never granted any such lands. The whole of the tract belonged at the time to the government of the United States. Mr. Hyde's deposition, the deposition of the surveyor-general and the other proofs, put this beyond dispute.

At the time of the sale Hyde executed a deed to Leonard, bearing date with the day the notes were executed, for that part of the land to which he thought he had a valid title, being half that he sold; and he gave a bond for title to Leonard for a future title to the other half, which he was to acquire. Leonard paid the whole purchase-money in cash at the time and in notes, to wit: $1200 in cash and $10,000 in his own notes, of which the note sued on is one, and the residue in the notes of others. All that was ever returned to Leonard's estate was about $11,000 of the notes when it was discovered there was no title to the land. He (Hyde) had parted with the residue, and had no means to restore the amount, thus leaving Leonard and his estate without any title whatever and never in possession, and loser to the amount of $34,000. It was in proof that the land or a portion of it which Hyde had sold and contracted to sell to Leonard, was sold in the usual mode by the United States government, in 1840, and Thistle individually through the rules embracing preëmption claims acquired a title to some of it as a purchaser from the United States government, to the land so sold. Hyde, the vendor, deposes that he was instrumental in procuring the title to Thistle to the amount of one hundred and sixty acres of land, which was procured through the preëmption of Hyde himself; and he states he was rendering this aid, as he thought, for the benefit of Leonard's estate, and considered Thistle as acting as executor or representative of the estate until after the land sales, when he was surprised to learn that Thistle was acting for himself. The will of Israel Leonard was in proof, in which he gave his estate to Mr. Thistle and Joseph Leonard, with $10,000 to a grandson at twenty-five years of age. The deposition of S. S. Prentiss was offered in evidence on the part of the plaintiff, (Glenn,) for the purpose of showing that when he was about to take the note for Glenn, that Thistle stated there were no offsets to it, and that it would be paid, at which time he was informed Thistle was executor of Leonard. This deposition was objected to on the ground that the note was indorsed by Prentiss, and thereupon the plaintiff's counsel wrote over the indorsement "Without

recourse." But the court sustained the objection and excluded the deposition, which is one cause of error assigned.

Several instructions were asked by the counsel on the trial, and refused by the court. In the first trial there was a verdict for the plaintiff, and a new trial was granted; upon the second trial there was a verdict for the defendant, when the plaintiff made a motion for a new trial, which was overruled by the court below.

*Montgomery & Boyd*, for plaintiff in error.

*McMurran*, for defendant in error.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The plaintiff brought suit on a promissory note for $3333.33, dated Natchez, January 11, 1839, payable one year after date at the Planters' Bank of Natchez, and signed by defendant's testator as maker, indorsed by defendant and others. The defence set up is failure of consideration, arising from want of title in the vendor of the land for which the note was given. There was a verdict for the plaintiff, but a new trial was granted, to which plaintiff filed his bill of exceptions. On the next trial the jury found for defendant, and the plaintiff excepted, and it was stated in the last bill of exceptions that all the same points that were excepted to by the plaintiff on the first trial had also arisen on the second, and that the case was to be considered as presented by the first bill of exceptions.

A large tract of land, described as lying in Louisiana, was sold by E. C. Hyde to Israel Leonard, the maker of the note, and the transaction is described by the deposition of Hyde, who was examined as a witness for the defendant. He says the note sued on was, amongst others, given for a tract of land sold by him to Leonard for $45,000; that he received in part payment sundry notes of third persons, $10,000 in cash, and the balance was secured by three notes of Leonard, for equal amounts payable in one, two, and three years, the

note sued on being one of them ; that the title by which he acquired the land failed, and consequently his title to Leonard; that the land was sold at the public land sales, which occurred some time afterwards, as part of the public domain. Hyde claimed the land by virtue of a deed from Broughton, and says Leonard was acquainted with the character of his title. At the time he conveyed to Leonard, he also gave him a bond to convey, at a future day, a like quantity of land lying back of that conveyed, and claimed as a back concession, for which he exhibited an order of location and entry from the commissioner of the general land-office. The witness ascertained that his title was defective in April or May, 1840, and immediately communicated the fact to Thistle. From this we infer that Leonard in the mean time had died. At the land sales T. L. Bailey obtained title to one hundred and sixty acres of the land conveyed in Hyde's deed, by virtue of preemption right; and Thistle acquired title to the balance, as well as for the back concession included in the bond; part of which was obtained from individuals, and part from the United States, amounting in the whole to about two thousand eight hundred and fifty acres. Thistle acquired his title through the assistance and exertions of the witness, but without any contract in relation to it. Preëmption claims which covered part of the land were bought by witness and Hurst, and paid for by them. The persons present at the land sales agreed that Thistle should become the buyer, believing that Hyde would be thereby relieved from the consequences of the failure of his title to Leonard. He says he informed his friends that such would be the effect, and Thistle stated to him that he wanted no advantage. And those who had acquired title to part of the land, conveyed them to Thistle, the object being to enable the witness to comply with his sale to Leonard, and to furnish a consideration for the payments received. Thistle furnished $4000 towards perfecting the title to the whole of the land, part of which was paid out by the witness in purchasing preëmption rights, and part paid into the land-office for land purchased at the auction sales. The amount of land sold to Leonard was one thousand four hundred and

Glenn v. Thistle, Executor.

seventy-seven acres, and the bond was for a like amount, making in all two thousand nine hundred and fifty-four acres. Soon after the failure of title was discovered, the witness returned to Thistle part of the notes received of Leonard, and at the land sales returned him all of the balance of them that were under his control, some of them having been disposed of very soon after they were received. They were returned to secure, as far as possible, the estate, of Leonard, on account of the failure of title. The witness exerted himself to procure and complete the transfer of titles to Thistle, but does not recollect that Thistle manifested uneasiness, or urged him to do so. Himself and friends were of the opinion, that by securing the land to Thistle, compensating for deficiency in quantity and payment of all money advanced, the whole affair would be settled; and but for this opinion Thistle could not have bought, as they would have prevented it. There were considerable improvements on the place, and also cattle, horses, farming utensils, &c. In all the transactions with Thistle, witness regarded him as acting in the capacity of executor, and was surprised to find, on attempting to settle with him, that he claimed to have acted for himself.

It is proved by the surveyor-general of Louisiana, that the lands described in the deed were vacant or public lands when Hyde sold. Broughton, who had sold to Hyde, had a claim to lands, but they laid in another township,, ten miles off. It seems from documentary evidence, that Hyde and Hurst each obtained patents in 1843 for a quarter section of land, which were founded on preëmption rights. These two quarter sections it is said fall within the land mentioned in Hyde's deed to Leonard. But the defendant also introduced deeds from Hyde and Hurst to Thistle, in each of which the consideration money is expressed to be $500, and the deeds bear date after the public land sales.

The plaintiff introduced Frederick Stanton, who proved that being about to take an assignment of the note sued on, he called upon Thistle, who was indorser, about the 5th of February, 1839, for information in regard to it, and was informed that there was no offset; whereupon witness inquired

if it would be necessary that he should see Leonard on the subject, and Thistle replied it would not, as he knew all about the transaction. The witness took the transfer and assigned the note to Prentiss, in payment of a claim due plaintiff. Stanton's competency was objected to, he being an indorser, but he had been discharged as a bankrupt, and the plaintiff's attorney, by permission of the court, wrote above his indorsement the words " Without recourse," and he was permitted to testify.

The deposition of Prentiss was taken, by which it appears Thistle, after the note was due and had been protested, went to him in company with Stanton, and in reply to an interrogatory propounded, stated that the note would be paid. Witness understood that Thistle was the executor, and on this assurance regarded the transfer as complete, but would not have considered himself bound to complete the arrangement with Stanton without such assurance. Prentiss' deposition was also objected to because he was indorser, but it seems he indorsed only as the agent or attorney, and without any interest or liability.

This is the substance of the evidence, and on it both parties required sundry charges to the jury, and those refused on the part of the plaintiff, and those given for the defendant, are now relied on as sufficient, amongst other causes, to reverse the judgment.

On this state of the case it seems there are two general questions, the decision of which must dispose of the case. First, Was there such a failure of consideration as to constitute a defence? and second, Has there been a waiver of the defence?

On the first point it is contended, that the failure of title must be total; that a partial failure cannot be set up at law. And then it is insisted, that as Hyde and his partner, Hurst, were entitled to a preëmption right as to two quarter sections of the land, the failure was not total. And then again, it is said, when a vendee takes covenants of warranty, there must be an eviction.

This note was given for land in Louisiana, and the law of

that State is relied on as controlling the contract. The law of Louisiana will of course control the title; it will decide whether the title has failed; but as the contract or payment was made here, and was to be performed here, the law of this State must decide on the effect of a failure of consideration. This question, however, does not seem to be very material, as the law in both States appears to stand very much on the same ground. In both a total failure and eviction seem to be necessary to full defence against the payment of the purchase-money. 3 Cond. Rep. Louis. 36; 3 Louis. Rep. 488; 8 Ib. 114; 7 Martin's Rep. 223; *Hoy* v. *Taliaferro,* 8 S. & M. 727.

We can have no hesitancy in deciding that there was a total failure of title in the present case. The witness, Hyde, who was the vendor, so states, and indeed this fact is only controverted in argument on the ground that to a small portion of the land Hyde and Hurst had a preëmption right. It seems to be true that each of them obtained patents for a quarter section. But admitting that they had such right, does that alter the case. By the act of 29th of May, 1830, a preëmption right was allowed to actual settlers, but the act expressly prohibited the assignment or transfer of such right, and declared all such made prior to the issuance of a patent, absolutely void. 4 U. S. Stat. at Large, 420. The act of June, 1834, revived the act of 1830, but it did not make the right assignable or transferrable. 4 U. S. Stat. at Large, 678. The act of 1830 was again revived by the act of 22 June, 1838; but this last act made it necessary, before a patent should issue, that the party should swear before a competent officer, that he entered upon the land which he claimed in his own right and for his own benefit, and that he had not, directly or indirectly, made any contract or agreement to transfer the title, or by which the title should inure to the benefit of any other person at any future time; and it further declared, that such agreements should be void. 5 Ib. 251. Now it is said, that Hurst obtained or held his preëmption under the act of 1834, and Hyde under the act of 1838. The deed from Hyde to Leonard was executed the 11th of February, 1839, and it is manifest that Hyde did not intend to convey any land to which he had but a

preëmption right.   On the contrary, he conveyed land, or professed to do so, which had been conveyed to him by Broughton, who derived title through Edward Broughton.   And how can a sale be sustained as valid in the face of the prohibitions in the preëmption laws, which not only prohibit transfers before patent, but declare them void?   Not only, then, was there no transferrable right in Hyde and Hurst under the preemption laws, and of course nothing was tranferred by the deed; but as soon as their title became complete by the issuance of patents, they conveyed to Thistle, in his individual capacity.   But it is said, these titles inured to the benefit of Leonard's heirs, and they were made to carry out, as far as possible, the original contract with Leonard.   Hyde does not say there was any contract between himself and Thistle on this subject, nor does he say that he informed Thistle as to the motive and object which caused him to be active in aiding Thistle to become the purchaser.   His mere opinions or private intentions can have but little influence in establishing a title in the heirs of Leonard.   But in view of this object of Hyde's, under the circumstances of this case, it is said Thistle could not acquire a title for himself, and must be regarded as holding for the estate of Leonard.   It is certainly true that an executor or other trustee must act in relation to the trust property, for the benefit of the *cestui que trust,* and cannot avail himself of his position, or of information which he acquires by it, to acquire adverse interests in the property.   But this principle results from the fact that it is his duty to act in good faith for the benefit of the estate, and necessarily pre-supposes a power in him so to act.   Now if Leonard had acquired a mere defective title, under a valid and binding contract, the executor could not have built up a better one on it for himself.   But Leonard had no title, and was not therefore bound by the contract.   The title was in the United States, and Thistle could only acquire it by a new contract, and the will does not confer power for that purpose.   He was bound to take the estate, and to deal with it as he found it. But in addition to this view, there is strong ground to suppose that the contract was rescinded.   As soon as the defect

of title was discovered, and it was as Hyde supposed, a defect as to the whole, he returned part of the notes, and afterwards returned all that were subject to his control. He did not profess to return the notes only in proportion to the failure, or to retain any part in consequence of the possibility of perfecting title as to part, but he went as far as he could towards a total abandonment, without manifesting any intention to regard the sale as good to any extent. And if he had had all the notes, we cannot doubt but they would have all been returned. *Sims* v. *Boaz*, 11 S. & M. 318. He says he discovered he had been mistaken, and returned the notes to save the estate. This looks like a total abandonment of the contract. True, he says at the land sales, he aided Thistle to procure titles, and acted under the impression that by securing titles to Thistle, by compensating for any deficiency, and by re-payment of the money advanced, the matter would be finally settled. But there was no contract to that effect; it was but his impression. It was evidently the result of an after-thought, by which it was supposed the contract might, to some extent, be saved. We cannot say, under these circumstances, that Thistle was precluded from acting for himself. Hyde certainly could not have forced Leonard, if living, to abide by this contract, and cannot force it upon his heirs. It seems, then, that as to Leonard, there was a total failure of consideration, before notice of transfer. Indeed, it does not appear that Leonard, in his lifetime, ever had notice of the transfer. It should here be remarked that the witness Hyde says, there were on the place, when sold, cattle, horses, and farming utensils, but it does not appear whether these were sold or not. They are not mentioned by the witness as a part of the consideration of the notes, nor are they specified in the deed.

As the title has failed, we come next to inquire whether the defence is made complete by eviction. The deed contains but a general covenant of warranty, and it has often been decided that there is not a total failure of consideration without eviction, or something equivalent. *Hoy* v. *Taliaferro*, 8 S. & M. 727; *Heath* v. *Newman*, 11 Ib. 201; *Dennis* v. *Heath*, Ib. 206; *Duvall* v. *Craig*, 2 Wheat. 45, and notes. But this

is a rule which may be subject to exceptions; or at all events, a sufficient eviction may be accomplished by various means. Delivery of seisin by the sheriff to the creditor in satisfaction of .the execution, is an eviction of the tenant, and constitutes a breach of the covenant of warranty. *Gore* v. *Brazier*, 3 Mass. R. 523; *Wyman* v. *Brigden*, 4 Ib. 150. And if one, having a paramount title, enter and hold adversely, it is equivalent to eviction. *Curtis* v. *Deering*, 3 Fairf. 499. And entry and legal possession taken under a mortgage, to which the estate was subject when conveyed to the tenant, constitute an eviction. *Tufts* v. *Adams*, 8 Pick. 547. The foregoing seem to have been regarded as cases of legal eviction without actual ouster. But this case stands upon even more favorable ground for the defence. The land belonged to the United States, which does not resort to a suit to evict the possessor; he may be turned off in a summary way. It was not necessary that the government should resort to a suit to establish title. Any one in possession of public land is either a trespasser, or holds by permission of some act of Congress. And a sale of the land by the government carries with it a constructive possession; and such sale constitutes, therefore, a legal eviction, or certainly what is equivalent to it. But further; if any one had possession, it must have been Thistle as executor, his wife being a joint legatee of all real estate; and if he has entered under a paramount title, this is equivalent to an eviction, as an actual ouster was impossible under the circumstances; and such title we have said it was competent for him to acquire. But, what is perhaps no less conclusive, nothing was said as to the possession. It does not appear from the record, whether Leonard ever had possession. The point seems to have been overlooked.

In the next place, has there been any waiver of the defence? If Leonard had been living, and had made the statement to Prentiss which was made by his executor Thistle, the matter would have been placed beyond dispute. Or if he had been consulted, and had replied to Stanton before the assignment was taken, as did Thistle as indorser, it would have been equally plain. But as it is, the question arises, Can an execu-

tor waive the defence of his testator? The authorities cited in support of the affirmative of this proposition have been examined, but none of them seem to come up to the point. The principle is this, When a contract of the testator cannot be enforced in a court of law, can the executor waive the defence by his promises, and thus make the estate liable? If he may withdraw one defence, he may any one of every character. We had occasion to examine this question, or at least a very similar one in *Henderson* v. *Ilsley*, 11 S. & M. 9, in which we held that an executor could not, by his promises, revive a debt barred by the statute of limitations, and the reasoning in that case which we still adhere to, will apply in this. Indeed, this is a much stronger case against the power of the executor. There the intestate in his lifetime had been bound; indeed, the bar was not complete until some time after his death. But in this case, Leonard never was bound; there was no binding contract, inasmuch as no consideration passed. And if the promise of the executor is to have the effect to destroy the defence, it is a new obligation. It is on principles of equity that the maker of a note is held bound to an assignee, who has been induced to take a transfer on the assurance that it would be paid. It would be a fraud upon the assignee to exonerate the maker under such circumstances. And this equity rests upon the acts of the party himself; it cannot be imposed upon his estate by his executor. It is the duty of the executor to discharge existing obligations, but it is not his duty or his privilege to create new ones, unless he be authorized to do so by law or by the will. The law places the executor in the shoes of the testator in regard to existing obligations, but it does not clothe him with the discretion which the deceased was at liberty to exercise. It is quite probable that, on a similar principle of equity, an executor might by such a promise render himself personally liable, but that is not the question. We do not think he can render the estate liable by such promises.

We have thus stated what we take to be the law of the case on the two general questions presented by the record, and on examining the charges given at the instance of the defendant,

5*

we find them to accord with our own view. The court refused to give two charges asked by the plaintiff, to wit: " When the consideration of a note is the sale of land for which the vendor gives a deed with warranty, there is no failure of consideration unless the purchaser has been evicted by a paramount title, and this eviction must be proved by the record of the suit." We have shown that such a charge would have been too broad. There might, in such case, be a partial failure of consideration. And we have seen that eviction may occur without a suit. Even the record of the suit would not prove actual eviction, but only a right to evict.

And again, the court refused to charge that " A mere outstanding title in another who does not sue for the recovery of the land, is not a breach of the covenant of warranty, and the existence of such title does not constitute a failure of consideration." As a general proposition this is very nearly correct, except that it assumes that there must be a suit. A suit is the usual mode of settling a right it is true, and therefore generally necessary. But we have said when the title is in the United States a suit is not necessary; and in this instance there could not have been a suit. Besides, the authorities show that a legal eviction may occur in certain cases without a suit.

It hence follows that the court correctly refused to grant a new trial, and in the granting of the first new trial we can see no error, inasmuch as the verdict was contrary to law and evidence; therefore, let the judgment be affirmed.